# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

TASHAWN THORNE,

Plaintiff,

v.

UNITED STATES OF AMERICA, et al.

Defendants.

Case No.  3:21-cv-50348

Jury Trial Demanded

## AMENDED COMPLAINT

1.     Plaintiff, Tashawn Thorne ("Thorne") by his undersigned attorneys and for his complaint against Defendants United States of America, James Dix, Andrew Drinkall, Harley Jacobson, Zachary Sigman, Brandon Boaz, Eric Conklin, Justin Alcala, Christian Marsh, Chandler Pendley, Quenton Terry, Benjamin Lodge, Apryl Liggett, Anthony Simcox, and Kenneth Dugdale states as follows:

## INTRODUCTION

1.     This is a civil action for damages arising out of an occurrence wherein federal prisoner Tashawn Thorne was denied psychiatric and medical treatment and placed in restraints then repeatedly physically assaulted by numerous Federal Bureau of Prison ("BOP") employees over a period of approximately three days in August 2020. The BOP employees' conduct violated the statutes of the United States of America 28 U.S.C. §§ 1346(b), 2671-2680, the Federal Tort Claims Act.  Additionally, the civil action is brought pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) to redress the deprivation of Plaintiff's rights as secured by the United States Constitution.  As a result of the BOP employees'

actions, Thorne is entitled to compensatory and punitive damages arising from the conduct of those BOP employees in the scope of their employment.

A.     **Jurisdiction and Venue**

2.     Thorne's claims for excessive force herein are asserted pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680 (hereinafter the "FTCA") and *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

3.     Plaintiff has satisfied the requirements of 28 U.S.C. § 2675(a) such that he can sustain an FTCA action against the BOP.

4.     On or about January 1, 2021, Plaintiff filed a Claim for Damage, Injury, or Death (Standard Form 95) in the amount of $20,000,000.00 with the Federal Bureau of Prisons-North Central Regional Office.

5.     On or about December 7, 2021, Plaintiff's Claim for Damage, Injury, or Death was denied in writing.

6.     As such, Plaintiff herein asserts claims for excessive force pursuant to the FTCA for the tortious acts and omissions committed by various BOP employees acting within the scope of their employment, and this court therefore has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1346(b).

7.     Plaintiff also asserts additional claims for deliberate indifference to medical care pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) for the alleged tortious acts and omissions committed by various BOP employees acting within the scope of their employment, and this Court therefore has  subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 2201.

8.     Plaintiff has exhausted all available administrative remedies through the BOP system related to these incidents.

9.     Thus, Plaintiff has exhausted his administrative remedies as are required and available pursuant to 42 U.S.C. § 1997e(a).

10.     The acts and omissions of the Defendants that form the basis of Plaintiff's claims occurred in the United States Prison—Thomson, in Thomson, Illinois ("USP Thomson"), making venue of this case proper in this district pursuant to 28 U.S.C. § 1391(b); 1402(b).

**B.     The Parties**

11.     Plaintiff Tashawn Thorne ("Plaintiff") is a federal inmate, prisoner identification number 59241-056, presently incarcerated at the United States Penitentiary located at 1100 One Mile Road, Thomson, Illinois 61285 ("USP Thomson").

12.     Defendant United States of America is sued under the Federal Tort Claims Act for the physical and resulting emotional injuries deliberately inflicted upon Plaintiff by officials and/or employees of the BOP working at USP Thomson from August 26-28, 2020.

13.     Defendant James Dix was an employee of the BOP working at USP Thomson on or about August 26-28, 2020.

14.     Defendant Andrew Drinkall was an employee of the BOP working at USP Thomson on or about August 26-28, 2020

15.     Defendant Harley Jacobson was an employee of the BOP working at USP Thomson on or about August 26-28, 2020.

16.     Defendant Zachary Sigman was an employee of the BOP working at USP Thomson on or about August 26-28, 2020.

17.     Defendant Brandon Boaz was an employee of the BOP working at USP Thomson on or about August 26-28, 2020.

18.     Defendant Eric Conklin was an employee of the BOP working at USP Thomson on or about August 26-28, 2020.

-3-

19.   Defendant Justin Alcala was an employee of the BOP working at USP Thomson on or about August 26-28, 2020.

20.   Defendant Christian Marsh was an employee of the BOP working at USP Thomson on or about August 26-28, 2020.

21.   Defendant Chandler Pendley was an employee of the BOP working at USP Thomson on or about August 26-28, 2020.

22.   Defendant Quenton Terry was an employee of the BOP working at USP Thomson on or about August 26-28, 2020.

23.   Defendant Benjamin Lodge was an employee of the BOP working at USP Thomson on or about August 26-28, 2020.

24.   Defendant Apryl Liggett was an employee of the BOP working at USP Thomson on or about August 26-28, 2020.

25.   Defendant Anthony Simcox was an employee of the BOP working at USP Thomson on or about August 26-28, 2020.

26.   Defendant Kenneth Dugdale was an employee of the BOP working at USP Thomson on or about August 26-28, 2020

27.   Those individual defendants identified in paragraphs 12-19 (sometimes collectively referred to as "Individual Defendants") are being sued pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) for the Plaintiff's physical and resulting emotional injuries deliberately inflicted upon him while he was in custody of the United States at USP Thomson from August 26-28, 2020.

**C.** **Plaintiff's Background Relevant to the Incident**

28. In approximately 2013, prior to his federal incarceration, Plaintiff was diagnosed with, among other things, the following psychiatric conditions: paranoid schizophrenia, multiple personality disorder, anxiety, and depression.

29. Due to his diagnoses, Plaintiff was prescribed Seroquel, a psychotropic medication used to treat, schizophrenia, bipolar disorder, and depression.

30. On or about August 3, 2015, Plaintiff was incarcerated for a conspiracy to distribute and possess with the intent to distribute 28 grams or more of cocaine base and was, as such, sentenced to 156 months' imprisonment.

31. Plaintiff was originally incarcerated at United States Penitentiary—Hazelton in Bruceton Mills, Preston County, West Virginia.

32. While at USP Hazelton, Plaintiff regularly received mental health treatment and spoke with a prison psychologist for mental health issues, including his diagnoses, self-inflicting harm, and suicidal ideations. As part of Plaintiff's treatment, USP Hazelton discontinued his Seroquel prescription and, instead, prescribed Remeron (Mirtazapine), a medication used to treat depression.

33. In 2018, Plaintiff was transferred to United States Penitentiary—Lewisburg in Lewisburg, Union County, Pennsylvania ("USP Lewisburg").

34. Upon arrival at USP Lewisburg, Plaintiff was denied any medication to treat his diagnosed and documented psychiatric conditions.

35. Then, in December 2019, Plaintiff was transferred to the Special Management Unit ("SMU") at USP Thomson. The SMU is a more restrictive unit for inmates who "present unique security and management concerns." U.S. DEP'T OF JUSTICE, FEDERAL BUREAU OF PRISONS,

PROGRAM STATEMENT P5217.02, SPECIAL MANAGEMENT UNITS (Aug. 9, 2016) at § 1, attached hereto as **Exhibit 1**.

36.     Nothing in Plaintiff's record reflects that he was a unique security concern such that he was a candidate for placement in the SMU, in reality his disciplinary record reflects non-violent infractions throughout his incarceration.

37.     In fact, the majority of those citations in Plaintiff's disciplinary record are infractions Plaintiff was given for allegedly masturbating that were improperly issued by USP Thomson officials to provide them with an excuse to punish and retaliate against Plaintiff as detailed below.

**D.     Failure to Provide Adequate Mental Health Care**

38.     The BOP Program Statement governing the SMU at USP Thomson specifically states that during the referral process transferring Plaintiff to the SMU, "[a] copy of the referral will be sent to the Psychology Services Branch, which reviews the inmate's mental health record to determine if mental health concerns preclude an inmate from being placed in a SMU." Ex. A at 1(a).

39.     Upon information and belief, no such screening was performed by the Psychology Services Branch as a diagnosed paranoid schizophrenic and individual with multiple personality disorder like Plaintiff would not be a candidate for a restrictive housing unit like the SMU at USP Thomson. *See* U.S. DEP'T OF JUSTICE, FEDERAL BUREAU OF PRISONS, PROGRAM STATEMENT 5310.16, TREATMENT & CARE OF INMATES WITH MENTAL ILLNESS (May 1, 2014) at § 8, attached hereto as **Exhibit 2** (stating that "[t]he Bureau strives to avoid prolonged placement of inmates with serious mental illness in setting such as . . . the Special Management Unit.").

40.     Nevertheless, even if Plaintiff had been properly placed in the SMU, USP Thomson was at a minimum required to provide "evaulat[ions] by mental health staff every 30 days." Ex. A at § 5(a)(16).

41.     Moreover, the BOP Program Statement for Special Management Units is clear that "[e]mergency mental health care is ***always available*** either at the institution or from the community" and "inmates with an identified need for routine and/or follow-up mental health services will receive these services." *Id.* (emphasis added).  This is highlighted by the BOP Program Statement 5310.16 governing the treatment and care of inmates with mental illness which states that "all inmates with mental illness in restrictive housing units . . . will receive, at a minimum, face-to-face mental health contacts consistent with the type and frequency indicated by their care level." Ex. 2 § 8(a).

42.     Upon arrival into the SMU at USP Thomson, Plaintiff continued sporadically speaking with a psychologist, however, he was not able to speak to a psychologist every 30 days, did not receive emergency mental health care when needed, and, like at USP Lewisburg, was denied his Remeron prescription or any other medication to treat his paranoid schizophrenia, multiple personality disorder, anxiety, and depression, despite his repeated appeals for medication.

**E.**     **USP Thomson Officers Refuse to Allow Plaintiff to Speak with Psychologist Despite Repeated Appeals to Speak with One**

43.     On August 26, 2020, Plaintiff was under the direct supervision of USP Thomson prison guards in the SMU.

44.     The Plaintiff's first cellmate was a federal inmate named Dexter Simmons ("Simmons").

45. During his morning shower on August 26, 2020, Plaintiff began to hear voices and experience suicidal ideations. Plaintiff returned to his cell where he refused to allow Simmons entrance into the cell.

46. Instead, Plaintiff notified Officer A. Drinkall, Officer C. Pendley, Officer Z. Sigman, and Officer E. Conklin that he was hearing voices, experiencing suicidal ideations, and needed to speak with a psychologist.

47. Despite the unequivocal BOP Program statement that "[e]mergency mental health care is **_always available_**," Officers Drinkall, Pendley, Sigman, and Conklin denied Plaintiff's request to speak with a psychologist and took Simmons to the USP Thomson Law Library, leaving Plaintiff in his cell alone.

48. After the USP Thomson Officers rotated shifts, Officer Q. Terry approached Plaintiff in his cell to inquire into his problems from earlier in the day.

49. Plaintiff explained to Officer Terry that he was hearing voices and experiencing suicidal ideations, and he again requested to speak with a psychologist to help him handle those mental health issues.

50. Officer Terry stated that Plaintiff was not going to see a psychologist at that time and ordered him to "cuff up"—i.e. allow handcuffs to be placed on prior to the cell door opening— so Simmons could return to the cell. Plaintiff refused to "cuff up" and Officer Terry left.

51. Shortly thereafter, Officer Terry returned to Plaintiff's cell with Officer B. Lodge. Officer Lodge gave Plaintiff a direct order to "cuff up," which Plaintiff refused.

52. Plaintiff then renewed his request to speak to a psychologist and explained to Officers Terry and Lodge that that he was hearing voices and experiencing suicidal ideations.

53. Again, Plaintiff's request for psychiatric assistance was denied.

54. After the third separate and distinct denial of Plaintiff's request for psychiatric care, Plaintiff, seeing no solution, swallowed more than 50 pills of his prescription Lisinopril, a medication used to treat high blood pressure, in an attempt to commit suicide.

55. Upon swallowing the Lisinopril pills, Plaintiff allowed Officer Lodge to place handcuffs on his wrists. Plaintiff's cell was then opened and Officer Terry escorted Simmons back into the cell. The cell door was closed and Plaintiff stated that he would not allow prison officials to remove his handcuffs.

**F.      Removal from the Cell and Placement in Restraints**

56. Officer Lodge then returned to the cell and informed Plaintiff that he needed to go see medical personnel due to swallowing the Lisinopril medication, so Plaintiff returned to the door.

57. When Plaintiff got to the cell door, Officer Lodge radioed the other officers to open the door. Officer Lodge then held Plaintiff's handcuffed wrists at the door and radioed the other officers to close the door to his cell.

58. Plaintiff, fearing injury to himself, became frightened and pulled his arms away from Officer Lodge.

59. Officer Lodge then ordered the doors be reopened and several officers, including Officers Terry and Lodge, rushed into Plaintiff's cell and bodily escorted him out of the cell.

60. In the hallway outside his cell, Plaintiff was stripped naked, put into paper garments, and placed into full ambulatory restraints.

61. USP Thomson prison guards then transported Plaintiff to Fox Range 1 where he was placed in Restraint Cell 1 still in full ambulatory restraints from August 26, 2022 until approximately 6:00a.m. on August 28, 2022.

62.     To the extent that restraints are allowed, they cannot be used in the following methods: (1) punitively; (2) in a manner that restricts circulation; (3) in a manner that causes unnecessary physical pain or discomfort; or (4) to secure an inmate to a fixed object. Those restraints certainly cannot be used as a means of retaliation, as was the case here, and as is the case with numerous other inmates at USP Thomson. U.S. DEP'T OF JUSTICE, FEDERAL BUREAU OF PRISONS, PROGRAM STATEMENT 5566.06, CN-1, USE OF FORCE & APPLICATION OF RESTRAINTS (Aug. 29, 2014) at § 6(h), attached hereto as **Exhibit 3**.

63.     The use of full ambulatory restraints for nearly 48 hours was in direct violation of 28 C.F.R. § 552.22 and BOP Program Statement 5566.06 in several respects, but it certainly was not proper based on what truly happened, i.e. it was used as retaliation and to cover up official misconduct.

**G.      Conduct by USP Thomson Employees While Plaintiff Remained in Full Ambulatory Restraints**

64.     While lying in the restraint cell on a concrete slab in Fox Range 1 in full ambulatory restraints, Plaintiff was examined by registered nurse Apryl Liggett and given a charcoal substance to counteract the Lisinopril he had consumed in his attempt to commit suicide. Plaintiff, after having been driven to attempt suicide, was also then finally provided with the opportunity to speak with a psychologist.

65.     Plaintiff remained in the restraint cell in Fox Range 1 in full ambulatory restraints that were tightened to the point he was unable to move out of a reclined position, in nothing but unsubstantial paper clothing for almost 48 hours solely for retaliatory reasons.

66.     From August 26 until the morning of August 28, 2020, nurses and prison guards periodically entered the restraint cell but neither the nurses or guards actually provided Plaintiff

with food, released Plaintiff from his painful position, responded to his pleas for assistance and/or medical attention, or took any action to relieve the pain caused by the tightly applied restraints.

67. Among the nurses and officers who came into the room and were deliberately indifferent to the Plaintiff's requests for medical assistance and/or alleviation of severe physical and mental discomfort were Nurses A. Liggett, A. Simcox, and C. Marsh as Officers J. Alcala, E. Conklin, A. Drinkall, C. Pendley, and B. Lodge whose deliberate indifference was a proximate cause of the injuries to the Plaintiff.

68. The result of the USP Thomson employees' deliberate indifference to the serious physical and psychological needs of Plaintiff were a proximate cause of the injuries to the Plaintiff.

69. Throughout the time period, guards would also come into the cell while Plaintiff was in the full ambulatory restraints, and they would continually tighten the ambulatory restraints to the point Plaintiff had difficulty breathing, was in extreme discomfort, was unable to rise into a sitting position or ambulate to the restroom, and had restricted circulation, as well as using their shields to physically abuse Plaintiff, even though he was completely defenseless and not in any way a danger to himself or others.

70. The use of restraints and shields to cause gratuitous pain to Plaintiff was part of a pattern of practice of officers at USP Thomson using their shields as weapons to inflict pain on inmates while they are in this defenseless position. Plaintiff was one of many who have been subject to such abuses by USP Thomson officers.

71. During the restraint checks, the USP Thomson officials would periodically use their shields, fists, feet, and/or night sticks to cause injury to the Plaintiff's face and body, including the use of excessive force to his face and groin.

72. One of the officers who used excessive force was Lieutenant J. Dix who tightened the ambulatory restraints until Plaintiff had difficulty breathing and lost feeling in his extremities, repeatedly stepped on and kicked Plaintiff's restrained hands, and struck him numerous times in the hand, hands and groin with a night stick.

73. Officer Z. Sigman used excessive force by tightening Plaintiff's waist restraint until Plaintiff was unable to breathe comfortably and forced to urinate on himself.

74. Officer H. Jacobson used excessive force by slamming his shield into Plaintiff's face, knocking out Plaintiff's front tooth—an injury that took months to get repaired.

75. Officer Q. Terry used excessive force by tightening the ambulatory restraints until Plaintiff had difficulty breathing and lost feeling in his extremities, as well as supplying Lieutenant Dix with a night stick used to beat Plaintiff.

76. Lieutenant K. Dugdale used excessive force by kicking and stomping on Plaintiff's hands, spitting on Plaintiff, and ordering other USP Thomson officers to show Plaintiff what happens to "gunners"—i.e. individuals who masturbate—leading to others repeatedly slamming their shield on Plaintiff's hands and wrists.

77. Officer B. Boaz used excessive force by choking Plaintiff while calling him racially insensitive slurs, including "ni****", tightening his full ambulatory restraints to the point he had difficulty breathing and lost feeling in his extremities, and beating Plaintiff's hands and wrists with a shield.

78. Officer B. Horton used excessive force by tightening Plaintiff's full ambulatory restraints to the point he had difficulty breathing and lost feeling in his extremities, as well as beating Plaintiff.

79.     Officer B. Lodge used excessive force by ordering other USP Thomson officers to tighten Plaintiff's full ambulatory restraints to the point he had difficulty breathing and lost feeling in his extremities.

80.     Officers Dix, Sigman, Jacobson, Terry, Dugdale, Boaz, Horton, and Lodge participated in the use of excessive force during the period of time when Plaintiff was in full ambulatory restraints, observed other officers using excessive force, and failed to intervene to prevent this use of excessive force from occurring and/or turned a blind eye or condone such misconduct.

81.     Officers Dix, Sigman, Jacobson, Terry, Dugdale, Boaz, Horton, and Lodge also knew the Plaintiff was physically and mentally being tortured and was in urgent need of medical care, yet they failed to intervene to prevent this deliberate indifference to his serious medical needs and/or he turned a blind eye or condones such misconduct.

82.     Being subjected to this sort of extended physical and psychological torture caused the Plaintiff physical pain and suffering, and extreme, permanent mental anguish.

83.     Being subjected to the extended use of ambulatory restraints also caused the Plaintiff permanent physical injuries, i.e. scarring and permanent damage to his wrists and ankles.

84.     Additionally, during this time period, USP Thomson officials should have been utilizing qualified health personnel monitoring and documenting their usage of full ambulatory restraints on Plaintiff, his temperament, and his treatment, but officials were deliberately indifferent to those procedures, violating 28 C.F.R. § 552.22(b)–(d), (f)-(h), (j) (2022); 28 C.F.R. § 552.26(a)–(b) (2022); 28 C.F.R. § 552.27 (2022), attached hereto as **Exhibit 4** is the complete text of all C.F.R. sections cited herein.

85.     The application of the restraints and the method in which it was conducted constituted excessive force and deliberate indifference to the serious medical needs of the Plaintiff; but it also specifically violated Section 552.22 of the Code of Federal Regulations in that it (1) was used to punish Plaintiff, (2) was more forceful than needed to gain control of Plaintiff, (3) continued long after staff regained control, (4) was not approved by the Warden, (5) restricted Plaintiff's circulation, (6) secured Plaintiff to a fixed object, and (7) was not carefully documented. *See* Ex. 4 at §§ 552.22(b)–(d), (f)-(h), (j).

86.     Moreover, the application of the ambulatory restraints was excessive and no attempt was made to seek the guidance of qualified health personnel as required by Section 552.26. *See* Ex. 3.

87.     Finally, the USP Thomson officials use of restraints was excessive and improper in that it violated Section 552.27 in that staff failed to appropriately document, in writing, its use of restraints on Plaintiff. *See* Ex. 4.

88.     As though these clear violations of the Code of Federal Regulations were not enough, the application of the restraints and the method in which it was conducted also specifically violated the BOP Program Statement governing the use of force and application of restraints in that USP Thomson officials applied the restraints (1) to punish Plaintiff, (2) in a manner that intentionally restricted circulation, (3) in a way to cause unnecessary physical pain and extreme discomfort, and (4) to secure Plaintiff to a fixed object.  Ex. 3 at § 6(h).

89.     USP Thomson officials violated BOP policy by failing to obtain video camera footage documenting the use of force incident and the subsequent medical examination of the Plaintiff.  Ex. 3 at § 14(c).

90.     The individuals identified above who were present during the misuse of the full ambulatory restraints and the use of excessive force during this torture session were deliberately indifferent to the serious medical needs of the Plaintiff.

91.     It was not until the morning of August 28, 2022 that Plaintiff was released from the severely restrictive ambulatory restraints, by which point, he had been restrained and repeatedly assaulted for almost two full days.

92.     As a result of the prolonged assault, Plaintiff suffered serious bodily injuries, including but not limited to, a lost tooth, injury to his wrists, mental and emotional distress, pain and suffering, and permanent scarring and disfigurement.

### Count I – Federal Tort Claims Act
**Excessive Force/Failure to Intervene to Prevent Excessive Force**
**Plaintiff v. United States of America**

93.     Plaintiff repeats and realleges paragraphs 1 to 79 of the Complaint as paragraph 80 of Count I.

94.     28 U.S.C. § 1346(b) expressly provides that:

(1)     Subject to the provisions of chapter 171 of this title, the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, *for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment*, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

(2)     No person convicted of a felony who is incarcerated while awaiting sentencing or while serving a sentence may bring a civil action against the United States or an agency, officer, or employee of the Government, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act.

28 U.S.C. §1346(b) (emphasis added).

95.     In an action brought pursuant to 28 U.S.C. § 1346(b), "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."  28 U.S.C. § 2674.

96.     As described in detail above, the USP Thomson prison officers and nursing staff supervising Thorne immediately prior to and during the assault were employees of the BOP, an agency of the United States Department of Justice, and were acting within the scope of their employment at all relevant times.

97.     At all times relevant herein, the BOP owed Plaintiff a duty of reasonable care.

98.     At all times relevant herein, the BOP had a duty to provide for the safekeeping and protection of Plaintiff pursuant to 18 U.S.C. § 4042(a)(2).

99.     The BOP breached its duty to Plaintiff by failing to keep him safe from physical and emotional assault inflicted on him by USP Thomson prison guards.

100.    The BOP further breached its duty to Plaintiff by failing to take action to protect him from the repeated assaults from USP Thomson prison guards after the BOP knew, or should have known, of the specific, immediate threat to Plaintiff from the USP Thomson prison guards, which failure constitutes a breach of duty by the BOP.

101.    The BOP failed to take any action to protect Plaintiff after the specific, immediate threat of assault to Plaintiff was known, or should have been known, by the BOP, which failure constitutes a breach of duty by the BOP.

102.    The injuries suffered by Plaintiff from the repeated assaults are the direct and proximate result of the aforementioned breaches of duty by the BOP.

103. The injuries suffered by Plaintiff from the repeated assaults are the direct and proximate result of the aforementioned breaches of duty by the BOP.

104. As a result of the aforementioned breaches of duty by the BOP, Plaintiff has suffered damages in the amount of $1,000,000.00.

**Count II – _Bivens_ Action**
**_Deliberate Indifference to Serious Medical Needs_**
**Plaintiff v. Defendants Drinkall, Pendley, Sigman, Conklin, Terry, Lodge, Liggett, Simcox, Marsh, Dix, Jacobson, Dugdale, Boaz, Alcala**

105. Plaintiff repeats and realleges paragraphs 1 to 91 of the Complaint as paragraph 92 of Count II.

106. _Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics_, 403 U.S. 388 provided that a violation of the United States Constitution by a federal agent acting under color of his authority gave rise to a cause of action for damages consequent upon the federal employee's unconstitutional conduct.

107. It has long been held "that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." _Estelle v. Gamble_, 429 U.S. 97, 104, 97 S. Ct. 285, 291 (1976) (internal citations removed).[1]

---

[1] On August 23, 2022 Plaintiff submitted a Standard Form 95 to the BOP to perfect his claim for deliberate indifference to medical care. When that claim is denied and perfected, or presumptively denied on February 23, 2023, Plaintiff intends to file a second amended complaint asserting a claim under the FTCA for deliberate indifference to medical care.

108.    The USP Thomson prison officers and nursing staff supervising Plaintiff, including the Individual Defendants, at the time that he requested permission to speak with a psychologist, as well as immediately prior to and during the continued assault from August 26-28 were employees of the BOP, acting within the scope of their employment at all relevant times.

109.    At all times relevant herein, the Individual Defendants owed Plaintiff a duty of reasonable care.

110.    At all times relevant herein, the Individual Defendants had a duty to provide for the serious medical needs of Plaintiff pursuant to the Eighth Amendment of the United States Constitution.

111.    The Individual Defendants breached their duty to Plaintiff by failing to keep him safe from physical and emotional assault inflicted on him by USP Thomson prison guards.

112.    The Individual Defendants further breached their duty to Plaintiff by failing to allow him to see a psychologist when he was known to be clinically depressed, explained he was having suicidal ideations, and requested to speak with a psychologist immediately.

113.    The Individual Defendants failed to take any action to protect Plaintiff after the specific, immediate threat of assault to Plaintiff was known, or should have been known, by the BOP, which failure constitutes a breach of duty by the Individual Defendants.

114.    The injuries suffered by Plaintiff from the denial of and deliberate indifference to medical care are the direct and proximate result of the aforementioned breaches of duty by the Individual Defendants.

115.    The injuries suffered by Plaintiff from the denial of and deliberate indifference to medical care are the direct and proximate result of the aforementioned breaches of duty by the Individual Defendants.

116.    As a result of the aforementioned breaches of duty by the Individual Defendants, Plaintiff has suffered damages in the amount of $1,000,000.00.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in his favor and against Defendants, award compensatory damages in the amount of $1,000,000.00, award attorney's fees and costs against the Defendants, and for such other and further relief as the Court may find is equitable and just.

PLAINTIFF DEMANDS TRIAL BY JURY

TASHAWN THORNE

DATED: October 25, 2022

By:    /s/ Lawrence C. Rubin
       One of His Attorneys

Lawrence C. Rubin (#2413426)
Allison M. Lovell (#6338163)
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2800
Chicago, Illinois 60601
Telephone: 312-527-4000
Facsimile: 312-527-3122
lrubin@taftlaw.com
alovell@taftlaw.com
Firm No: 29143

74810361v4

-19-